**LAS BRISAS, S.E., Plaintiff,**

v.

**DEPARTMENT OF AGRICULTURE FARMER'S HOME ADMINISTRATION (UNITED STATES OF AMERICA), Defendant.**

**Civil No. 97–1582(RLA).**

United States District Court,
D. Puerto Rico.

May 28, 1998.

---

Ernesto F. Rodríguez Suris, Hato Rey, PR, for Plaintiff.

United States Attorney, U.S. Attorney's Office, Hato Rey, PR, for Defendant.

## OPINION AND ORDER

ACOSTA, District Judge.

This action involves the claims of two creditors vying for preference of their respective liens encumbering a debtor's property. Plaintiff, as current holder of a second mortgage, is attempting to displace defendant whose mortgage is registered as a first lien.

Additionally, plaintiff contends that the Government illegally failed to transmit to it all excess amounts received from an assignment of rents paid by the debtor's lessee.

## I. UNCONTESTED FACTS

The following facts are not in controversy.[1]

1. Plaintiff LAS BRISAS S.E., is a special partnership, duly organized and existing pursuant to the laws of the Commonwealth of Puerto Rico and authorized to sue and be sued.

2. Defendant, DEPARTMENT OF AGRICULTURE—Farmers Home Administration (FmHA) is duly represented by the Government of the United States of America.

3. On **October 8, 1987**, CARIBBEAN RESTAURANTS, INC. and PABLO ALICEA entered into a contract whereby CARIBBEAN RESTAURANTS, INC. leased from PABLO ALICEA certain real property for the establishment of a restaurant business.

4. On or about **August 10, 1990**, CARIBBEAN RESTAURANTS, INC. and PABLO ALICEA executed deed number thirty-four A (34–A) a deed of Lease Subordination.

5. Pursuant to the above-mentioned Lease of Subordination, CARIBBEAN RESTAURANTS, INC. acquiesced to subordinating the rank of its registered lease contract at the Registry of Property to a certain deed of mortgage or deeds of mortgage entered into and executed by and between PABLO ALICEA, as mortgagor, and FmHA, as mortgagee.

6. The above-mentioned deed(s) of mortgage was/were for loan(s) to be disbursed by FmHA to PABLO ALICEA for the sums of $230,000.00 and $200,000.00.

7. The $230,000.00 loan was registered in the corresponding Registry of Property as a first lien and the $200,000.00 as a second lien.

8. The $230,000.00 loan was an "emergency loan" with interest charged at 4½%. Payment was to be made by way of yearly installments with the last payment due in 10 years, i.e., August 2000.

9. An essential condition of the Lease of Subordination was that FmHA would pay and cause to be canceled, from the monies to be disbursed to PABLO ALICEA all prior liens and encumbrances, including those mentioned and listed in the Lease of Subordination.

10. On **August 10, 1990** an additional contract was entered into between PABLO ALICEA and CARIBBEAN RESTAURANTS, INC. assigning to FmHA the rents due to PABLO ALICEA pursuant to the lease contract.

11. On or about **August 17, 1993** PABLO ALICEA entered into a refinancing loan with R & G FEDERAL SAVINGS BANK ("R & G") for the total sum of $275,000.00.

12. The proceeds of this refinancing agreement were used to liquidate the $200,-

---

1. *See* Statement of Uncontested Facts, filed by the parties on October 7, 1997 (docket No. **14**). The court has excluded those allegations submitted as to which the parties are in disagreement and has included additional uncontested facts which are relevant to the issues presented for disposition.

000.00 loan and the FmHA's second lien was duly canceled.

13. The R & G refinancing loan was secured by a mortgage which deed was also duly registered in the corresponding registry of Property and became a second lien.

14. From the proceeds of this refinancing loan with R & G, PABLO ALICEA was delivered by R & G a manager's check in the sum of $34,824.00 payable to FmHA. The purpose of this check was that it be delivered to FmHA so that the Agency would then allow CARIBBEAN RESTAURANTS, INC. to pay directly to R & G the monthly installments corresponding to said amount.

15. PABLO ALICEA breached his agreement and misapplied the proceeds of said check depositing it in his personal account.

16. On **August 17, 1993** PABLO ALICEA and R & G entered into an assignment contract whereby PABLO ALICEA assigned and ceded to R & G, from the monthly rents to be paid to PABLO ALICEA by CARIBBEAN RESTAURANTS, INC., an amount equal to the monthly payment then and thereafter to become due and payable by PABLO ALICEA to R & G.

17. This assignment was made by PABLO ALICEA to R & G notwithstanding the fact that PABLO ALICEA had previously made an assignment in favor of FmHA.

18. On **April 14, 1995** FmHA and PABLO ALICEA entered into an Accelerated Repayment Agreement for the amounts due under the **August 10, 1990** emergency loan for $230,000.00. The principal amount due under the Accelerated Repayment Agreement was $139,649.83 (unpaid balance of $138,930.43 and the accrued interest of $719.40). The interest rate for the new loan was 9.25% and payment was to be made in monthly installments with the final payment due April 2000.

19. The assigned rental payments from CARIBBEAN RESTAURANTS, INC. exceeded the monthly payments now due by PABLO ALICEA to FmHA under the Accelerated Repayment Agreement. This difference was returned by FmHA to PABLO ALICEA.

20. Premised on PABLO ALICEA's continued and continuous default of his obligations towards R & G, the latter filed suit for collection of monies and mortgage foreclosure.

21. On or about **December 31, 1993** LAS BRISAS purchased or acquired from R & G the credit or promissory note which evidence the amounts owed by PABLO ALICEA to R & G, as well as all related guarantees and collateral.

22. On **January 12, 1994** LAS BRISAS notified PABLO ALICEA that it had acquired such credit and guarantees.

23. LAS BRISAS continued the civil action begun by R & G against PABLO ALICEA and on **March 18, 1997** the Court of First Instance of Puerto Rico, Bayamon Part issued judgment whereby PABLO ALICEA was ordered to satisfy to plaintiff certain sums of money, a certain pledge agreement be foreclosed, as well as the foreclosure and public sale of the property encumbered by the mortgage lien therein executed.

## II. CLAIMS

The claims asserted by plaintiff in this action are two-fold.

First we must determine whether or not the Accelerated Repayment Agreement entered into between FmHA and PABLO ALICEA constituted a novation of the original loan and if so, whether the guarantees offered as collateral were thus extinguished.

Further, we must also inquire as to whether or not FmHA had an obligation to remit to R & G/LAS BRISAS—as opposed to PABLO ALICEA—any surplus of the rental payments received from CARIBBEAN RESTAURANTS, INC. pursuant to the assignment of rents.

The court finds that based on the facts not in controversy as well as the evidence in the record we may dispose of this action by way of summary judgment. *Cadle Co. v. Hayes,* 116 F.3d 957 (1st Cir.1997).

## III. ACCELERATED REPAYMENT AGREEMENT

### A. *Novation* [2]

Plaintiff argues that the modifications to the August 1990 loan caused by the Accelerated Repayment Agreement of April 1995 were such that it constituted a new contract and that all related guarantees were thereby extinguished. Defendant insists that the original obligation remained unchanged.

The Civil Code of Puerto Rico provides that subsequent agreements entered into between contracting parties may **modify** or even **extinguish** their previous obligations. This is called "novation" which can be accomplished by either changing the object and/or the principal conditions of existing obligations. P.R. Laws Ann. tit. 31, § 3241(1) (1991); José Ramón Vélez Torres, Derecho de Obligaciones 228 (2nd ed.1997). Novation may take different forms depending on whether it has the effect of extinguishing the original obligation—extinctive—or merely modifying it—modificative. *Id.* at 227; *Miranda Soto v. Mena Ero*, 109 D.P.R. 473, 1980 WL 138572 (1980) (two types of novation exist, modificative and extinctive).

Extinctive novation has been defined as the extinction of an obligation by the creation of a new one destined to replace it; that is, the substitution of an obligation by another one. Guaroa Velázquez, Las Obligaciones § 351, 195–6; Vélez Torres at 224. Extinctive novation has the effect of completely suppressing and extinguishing the former relationship and creating a new one. Guaroa Velázquez § 352 at 196. Extinctive novation has a double effect; it extinguishes the previous obligation and a new one arises in its place. *Id.* § 362 at 201.

However, in order for an obligation to replace another, the parties' intention to bring about this result must be evident and/or the old and new obligations must mutually exclude each other.

In order that an obligation may be extinguished by another which substitutes it, it is necessary that it should be so expressly declared, or that the old and the new be incompatible in all points.

P.R. Laws Ann. tit. 31, § 3242 (1991).

Thus, in order to determine the possible effect subsequent obligations may have upon a prior relationship, the intention of the parties must be examined. However, this intention is not always explicit, it may be tacitly implied from the nature of the changes to either the object of the contract and/or its principal obligations. Since novation denotes the abandonment of a right by the creditor, there must be an intention to novate on his part. This intention may be express or tacit. Tacit is when incompatibility is a result of the two obligations. Guaroa Velázquez § 359 at 22.

Novation is never presumed; it must be clearly established. *Warner Lambert v. Tribunal Superior*, 101 D.P.R. 378, 389, 1973 WL 35652 (1973). Therefore, he who alleges novation carries the burden of proof. Guaroa Velázquez § 359 at 200. The courts, as a mixed question of law and fact, will have to determine whether variances exist between both obligations and whether or not both obligations may subsist simultaneously. If total incompatibility is proven, extinctive novation exists. Vélez Torres at 226.

When the variation to the object or conditions of the contract is merely incidental the prior obligation has not been substituted by a new one. *See* Vélez Torres at 229; I–II José Puig Brutau, Fundamentos de Derecho Civil 398–9 (4th rev. ed.). *See also Constructora Bauzá, Inc. v. Garcia López*, 91 JTS 99 (extinctive novation found in construction contract due to substantial variation in principal conditions originally agreed upon by the parties).

For extinctive novation to exist, the new obligation must introduce essential alterations to the old one. When the essential conditions of an agreement such as the object, price and duration remain basically

---

**2.** Defendant makes a cursory reference to the applicability of federal law to this case and cites *U.S. v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) without any further argument or justification for this position. The Government having failed to show otherwise, we proceed to apply local contract and mortgage law interpretation principles to the facts of this case.

unchanged there is no extinction. Antonio Hernández Gil, III Obras Completas—Derecho de Obligaciones 533–34 (1988).

The incompatibility contemplated by § 3242 is absolute. It presupposes a change so radical in the nature of the new obligation that the old and the new cannot continue to coexist; they mutually exclude each other. *Goble & Jimenez, Inc. v. Dore Rice Mill, Inc.* 108 D.P.R 89, 96, 1978 WL 48801 (1978). *See Warner Lambert,* 101 D.P.R. at 393 (the incompatibility referred to in § 3242 refers to an "absolute" incompatibiltiy). The old and new obligations must be incompatible from all points. Hernández Gil at 533.

In the case of *Figueroa v. Banco De San Juan,* 108 D.P.R. 680, 1979 WL 59105 (1979) the court found that the issuance of a subsequent promissory note changing only the due date for payment not did not have an extinguishing effect. The court held that under these circumstances the original obligation remained unchanged; the new obligation was compatible with the previous obligation and that neither the cause nor the object of the original loan had been altered.

 One of the criteria utilized to determine whether there is incompatibility is to determine whether the alterations to the object of the contract are qualitative or quantitative. An alteration is deemed qualitative when the obligation is substituted by another of a different nature. When it merely affects the quantum of the obligations previously agreed upon, the modification is considered purely quantitative and does not affect the original relationship. *Goble & Jimenez,* 108 D.P.R. at 96.

In *Warner Lambert,* 101 D.P.R. at 393 the court found that an increase in the amount of commission to be paid under the contract was not sufficient to totally do away with the previous terms of the relationship. The court reasoned it was merely a "quantitative" alteration of the object of the contract which still left the structure of the obligation intact.

 In the case at bar the original loan of August 1990 was classified as an "emergency loan" in the principal amount of $230,-

000.00 with interest charged at 4½% per annum. Payment was to be made in **yearly** installments with the last one due and payable in **August 2000.**

Emergency loans are granted by FmHA for federal assistance to farmers in response to their needs resulting from natural disasters 7 C.F.R. § 1945.20 (1998). Applicants may not qualify for credit from other lending sources. 7 C.F.R. § 1945.156 (1998).

The objective of EM loans [emergency loans] is to provide financial assistance to cover actual losses sustained by eligible farmers, so that they can return to normal farming operations after sustaining substantial losses as a result of a declared/designated disaster. EM loans are made to assist eligible disaster farm victims rehabilitate and resume their normal operations . . . .

7 C.F.R. § 1945.152 (1998).

The use of the emergency loan proceeds is limited to those purposes specifically identified in the regulations, 7 C.F.R. § 1945.166 (1998). These loans have available lower interest rates. 7 C.F.R. § 1945.168(a) (1998) and "[t]he borrower has the responsibility of achieving the objectives of the loan . . . by . . . using loan funds for, planned purposes only". 7 C.F.R. § 1945.152 (1998).

The regulations also provide for "accelerated repayment agreements" of outstanding loans in the event that a borrower fails to graduate to other credit or fails to operate as required by the regulations, 7 C.F.R. § 1965.26(e) (1998), and the loans have not fully matured. 7 C.F.R. § 1945.168(d) (1998).

FmHA and PABLO ALICEA entered into an "accelerated repayment agreement" on **April 14, 1995.**[3] The principal amount appeared as **$139,649.83** (outstanding principal plus interest due); the interest increased from 4½% to 9.25%; payment was to be made in **monthly** installments with the last one due in **April 2000.** The loan was reclassified from an emergency loan to a nonprogram loan ("other real estate") pursuant to the

---

**3.** The parties disagree as to the reasons which prompted the Accelerated Repayment Agreement. However, for purposes of our ruling this issue is immaterial.

regulations. *See* 7 C.F.R. § 1965.26(e)(4) (1998) (loans modified under accelerated repayment agreements will be **"reclassified as NP [nonprogram] loans"**) (emphasis ours). Nonprogram loans have more onerous terms and "are extended to persons ineligible for program benefits". *See* 7 C.F.R. §§ 1951.203(f) and 1951.451(a) (1998).

The nature of the April 1995 loan, the amount of the principal debt as well as all the terms and conditions related to the contract were changed as a result of the Accelerated Repayment Agreement. The loan was no longer considered an emergency loan eliminating thereby the more beneficial terms initially applied. The interest due under the original loan was computed as principal under the new loan; the applicable interest rate was practically doubled; payments were required to be made on a monthly basis instead of yearly installments and the expiration date of the loan was shortened. These changes, which were carried out for the convenience of the Government,[4] cannot be regarded as merely quantitative in nature particularly when the only thing that remained unchanged was the parties to the contract. On the contrary, because all of the terms and conditions of the loan as well as its character varied, we find that the terms of the old and the new obligations are mutually exclusive. Thus, an extinctive novation took place and the previous relationship was substituted by a new one.

### B. *Guarantees*

 Upon novation, the original obligation disappears together with all its guarantees, P.R. Laws Ann. tit., 31 § 3245 (1991), *Warner Lambert,* 101 D.P.R. at 391 and Guaroa Velázquez § 363 at 202, unless the parties otherwise stipulate. Eduardo Vázquez Bote, V Tratado Teórico, Práctico y Crítico de Derecho Privado Puertorriqueño—Derecho de Obligaciones § 10.4 at 400 (If the parties agree that novation will not affect the previous guarantees these will subsist as well as any accessory obligations).

In this case the evidence is clear that the parties intended for the new loan to continue to be guaranteed by the same collateral, i.e., a mortgage over the borrower's property.

The contract stipulations expressly provided that all guarantees under the emergency loan would continue in full force and effect. The Accelerated Repayment Agreement made reference to the mortgage deed securing the emergency loan as well as all pertinent recordation data in the Registry of Property. It further established that the agreement was reached without the "Government's foregoing any present rights it may have to enforce the listed **security instrument(s)**" (emphasis ours).

In this regard, the contract reads:

4. Should Borrower fail to make any one or more payments when due... the Government shall have the **same rights and remedies under the provisions of the listed debt and security instrument(s)** as it would have in respect to failure by Borrower to pay any amount due under, or to comply with any provision of, those debt or security instrument(s). **The provisions of the debt and security instrument(s) shall, except, as modified by this agreement, remain in full force and effect, and nothing in this agreement shall be construed as constituting a release or satisfaction of the indebtedness under the debt and security instrument(s).**

(emphasis ours).

Further, the regulations establish that accelerated repayment agreements will be authorized if the borrower "will continue to comply with other requirements of the loans and **security instruments**". 7 C.F.R. § 1965.26(e)(1–3) (1998) (emphasis ours).

 However, because the original obligation was extinguished by novation the corresponding mortgage lien also disappeared. The essential feature of a mortgage is that it is an accessory obligation. P.R. Laws Ann. tit., 31 § 5001 (1991). As such, it cannot exist independent of the principal obligation which it guarantees. Therefore, a mortgage will subsist as long as the obligation it se-

---

**4.** *See* 7 C.F.R. § 1965.26(e)(1) (1998) (accelerated repayment agreements authorized if necessary to protect the government's financial interest).

cures is in effect. "In our system a mortgage is an accessory right of the ensured credit; it is born and dies with it." Ramón Roca Sastre, IV Derecho Hipotecario (1948) 34. Should the principal obligation cease, the mortgage right will also become extinguished. *See Trabal Morales v. Ruiz Rodriguez*, 125 D.P.R. 340, 350, 1990 WL 710183 (1990) (mortgage extinguished by expiration of principal obligation); *Liechty v. Descartes Sauri*, 109 D.P.R. 496, 501–2 (1980) (an essential element of the mortgage is that it be constituted to ensure compliance of a principal obligation; its accessory character implies that the mortgage will only subsist while the credit it guarantees exists).

▮ Thus, since the original loan was extinguished by virtue of novation so did the mortgage which guaranteed its payment. Further, in order for a mortgage to affect real property and third parties it must be recorded. *Martinez v. Colon Franco*, 125 D.P.R. 15, 33–4, 1989 WL 608549 (1989) (mortgage must appear in a public deed and recorded); *Rosario Perez v. El Registrador*, 115 D.P.R. 491, 494, 1984 WL 270924 (1984) (recordation enables the mortgage to produce its effects *erga omnes* ). *See also* P.R. Laws Ann. tit., 30 § 2607 (1993).

▮ Since a new obligation has arisen by virtue of novation, any mortgage intended to secure this new debt must be recorded at the Registry of Property. This mortgage will have the corresponding rank at the time of recordation.[5]

## IV. FAILURE TO REMIT RENTAL PAYMENTS

We will now address plaintiff's second claim regarding the excess rental payments.

As a result of the Accelerated Repayment Agreement the monthly rent paid by CARIBBEAN RESTAURANTS, INC. to PABLO

ALICEA, which had been assigned to FmHA, was higher than the monthly installments due by PABLO ALICEA to FmHA. This excess was returned by FmHA to PABLO ALICEA. LAS BRISAS contends that FmHA was aware that PABLO ALICEA and R & G had likewise entered into a contract for the assignment of the rents due PABLO ALICEA from CARIBBEAN RESTAURANTS, INC. It further alleges that FmHA acted illegally and negligently by not transferring and ceding to LAS BRISAS, as the true and legal successor of R & G, all amounts received by FmHA from CARIBBEAN RESTAURANTS in excess of any amounts owed to FmHA pursuant to the Accelerated Repayment Agreement with PABLO ALICEA. Defendant denies these allegations and contends that the monies were turned over to the debtor pursuant to its regulations.

The nature of this action is not clearly identified in the complaint or the memoranda. Plaintiff does not clearly spell out the legal underpinnings of this monetary claim nor does it specify the particular sum of monies sought. The prayer in the complaint, which is limited to equitable relief, does not make any monetary demand. It reads:

> WHEREFORE, it is most respectfully requested from this Honorable court that, pursuant to the Declaratory Judgment Act it issue order and judgment demanding that Farmer's Home first lien be canceled.

The only reference to the alleged wrongful return of monies by FmHA appears at paragraph 21 of the complaint which reads as follows:

> 21. At the time when Farmers Home [refinanced the outstanding loan]... it did so in an illegal manner and in contravention to it's (sic) charter since it breached the fiduciary relationship with plaintiff in so far as it, **illegally, failed to comply**

---

5. P.R. Laws Ann. tit., 30 § 2606 (1993) reads:
 Any transaction or agreement between the parties that may modify or destroy the validity of a prior mortgage obligation, such as a payment, compensation, grace period or extension, the agreement or promise not to request the substitution of the original contract and the transaction or commitment shall not become effective against a third party, unless it appears in the Registry as a new registration, as a total or partial cancellation, or as a notation, whichever is applicable.
 It a transaction or agreement between the parties leads to a total or partial substitution of the recorded contract, a new registration shall be made....
 *See also* P.R. Mortgage Law Regulation 164.1.

with it's (sic) obligation to transfer and cede to plaintiff, as the true and legal successor of R & G, all amounts received by Farmers Home from Caribbean Restaurants in excess of any amounts owed to Farmers Home pursuant to it's new (third) loan to Alicea.

(emphasis ours).

The United States as sovereign, may not be sued for monetary relief unless it has specifically waived its immunity.

It is well settled that the United States, as sovereign, may not be sued without its consent. Jurisdiction must be found in an express Congressional waiver of immunity or consent to be sued. In general, statutes waiving sovereign immunity should be strictly construed in favor of the United States.

*Murphy v. United States*, 45 F.3d 520, 522 (1st Cir.1995) (citations omitted).

The complaint asserts jurisdiction under 28 U.S.C. §§ 1331, 2410 and 1346. The first provision, § 1331 is merely a jurisdictional statute which is not in itself a waiver of immunity for monetary claims. An express waiver and consent to be sued must exist for an action against the United States to proceed. *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *Melo–Tone Vending, Inc. v. United States*, 666 F.2d 687, 690 (1st Cir.1981); *Taydus v. Cisneros*, 902 F.Supp. 278, 283 (D.Mass. 1995).

Additionally, the allegations for the alleged failure to remit monies clearly do not fall within the parameters of 28 U.S.C. § 2410. This statute allows the United States to be sued in actions to quiet title, foreclose, partition, condemn or otherwise dispose of a property over which the United States has a lien. However, it is obvious that the purpose of actions brought under § 2410 is not to demand monies from the Government based on the misconduct of its employees but to ensure that the Government is provided with an opportunity to enforce its liens and/or redeem such properties to minimize losses.

**6.** *See* Reply to Plaintiff's Memorandum (docket

Lastly, plaintiff intimates that this is an action for "tortious interference with contract rights".[6] However, pursuant to 28 U.S.C. § 2680(h) this particular type of claim is expressly exempted from the Federal Tort Claims Act ("FTCA") which is the exclusive legal remedy for torts committed by federal employees even when an exception to the statute precludes government liability. *Aversa v. U.S.*, 99 F.3d 1200, 1207–8 (1st Cir. 1996) (emphasis ours).

Further, even assuming that plaintiff has presented a colorable claim under the FTCA, it has failed to establish that it previously complied with the jurisdictional prerequisite of filling an administrative claim as mandated by 28 U.S.C. § 2675. *See Coska v. U.S.*, 114 F.3d 319, 322 (1st Cir.1997) (tort claim against the United States barred unless an administrative claim presented).

Accordingly, we have no jurisdiction to entertain plaintiff's action based on defendant's failure to remit the rental payments and this claim is hereby **DISMISSED**.

## V. CONCLUSION

Based on the foregoing, Plaintiff's Memorandum, filed on October 10, 1997 (docket No. 15), Defendant's Memorandum filed on October 31, 1997 (docket No. 20) and Reply to Defendant's Memorandum, filed on November 21, 1997 (docket No. 22) are hereby disposed of as follows:

a. The Accelerated Repayment Agreement of April 14, 1995 extinguished the original loan of August 10, 1990 together with all its guarantees under the applicable principles of novation.

b. Plaintiff's claim based on the failure of FmHA to remit the excess monthly rental payments is **DISMISSED**

Judgment shall be entered accordingly.

IT IS SO ORDERED.